UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| RICARDO RAMIREZ,<br><br>    Plaintiff,<br><br>vs.<br><br>WRIGHT TREE SERVICE, INC., ITC HOLDINGS CORP., ITC MIDWEST, LLC, and JIM BAUER,<br><br>    Defendants.<br>` | CIVIL NO. 4:22-cv-312<br><br><br>COMPLAINT AND JURY DEMAND |

COMES NOW the Plaintiff, Ricardo Ramirez, and for his cause of action against the Defendants Wright Tree Service, Inc., ITC Holdings Corp., ITC Midwest, LLC, and Jim Bauer respectfully states:

## INTRODUCTION

1.     At all times pertinent herein the Plaintiff, Ricardo Ramirez (hereinafter referred to as "Ramirez"), was and is an individual and resident of the State of Iowa.

2.     At all times pertinent herein the Defendant, Wright Tree Service, Inc. (hereinafter referred to as "Wright Tree Service"), was and is a legal entity with its home offices in West Des Moines, Polk County, Iowa, incorporated in and operating under the laws of the State of Iowa.

3.     At all times pertinent herein the Defendant, ITC Holdings Corp. (hereinafter referred to as "ITC"), was and is a legal entity with its home offices in Novi, Michigan, incorporated in and operating under the laws of the State of Iowa.

4.     At all times pertinent herein ITC subsidiary, Defendant, ITC Midwest, LLC (hereinafter referred to as "ITC Midwest"), was and is a legal entity with its home offices in Novi, Michigan, incorporated in and operating under the laws of the State of Iowa.

5.      Upon information and belief, Defendant, Jim Bauer (hereinafter referred to as "Bauer"), was at all times material hereto, was a current or former employee of Wright Tree Service, ITC and/or ITC Midwest and a resident of Iowa.

6.      Jurisdiction is conferred on the Court for the resolution of federal questions pursuant to 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court under 23 U.S.C. § 139(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.      The amount in controversy in this matter exceeds $75,000.00, the jurisdictional requirement for this Court.

## FACTUAL BACKGROUND

10.      Plaintiff repleads and incorporates Paragraphs 1–9 and Paragraphs 71–139 as if pled here.

11.      Defendant Wright Tree Service provides vegetation management, storm restoration, and work planning services to utility companies.

12.      As part of its work, Wright Tree Service removes and trims trees near electrical transmission and distribution lines and near railroads.

13.      Defendant ITC is an independent electricity transmission company and is the parent company to multiple subsidiaries in the Midwest and Great Plains Regions.

14.     Through its subsidiaries, Defendant ITC owns and operates high-voltage transmission infrastructure in multiple states, including, Illinois, Iowa, Kansas, Michigan, Minnesota, Missouri, and Oklahoma.

15.     Defendant ITC Midwest is a subsidiary of ITC.

16.     Defendant ITC Midwest operates more than 6,600 circuit miles of transmission lines in Iowa, Minnesota, Illinois, and Missouri.

17.     Wright Tree Service performs utility tree work on behalf of ITC and/or ITC Midwest, including work in the state of Iowa.

18.     Wright Tree Service employed Plaintiff in various capacities for approximately ten (10) years, ending in September 2020.

19.     Most recently, Wright Tree Services employed Plaintiff as a supervisor.

20.     As a supervisor for Wright Tree Services, Plaintiff oversaw work crews performing utility tree work throughout the northern half of the state of Iowa.

21.     At the end of his employment, Plaintiff was responsible for all Iowa work performed north of Interstate 80.

22.     Defendant Jim Bauer was Plaintiff's supervisor.

23.     Plaintiff's work schedule provided that Plaintiff was to work 10 hours per day on Monday through Thursday.

24.     Defendants would sometimes ask Plaintiff to work on Fridays and provided overtime pay when doing so.

25.     However, the scope of Plaintiff's duties often required him to work more than 10 hours a day during the regular Monday through Thursday work week.

26.     For example, Plaintiff often needed to spend extra hours translating documents for Wright Tree Service employees who did not speak English.

27.     Defendants did not pay Plaintiff overtime for these additional hours.

28.     Defendants knew they were not paying Plaintiff overtime for all of the extra hours he was working.

29.     Defendants nonetheless continued to deny Plaintiff these overtime payments.

30.     In approximately July 2020, Plaintiff was responsible for overseeing several crews performing utility work west of Cedar Rapids, Iowa.

31.     The utility work ran along a railway line stretching approximately 25 miles between Hiawatha, Iowa, and Vinton, Iowa.

32.     Federal and state law provides extensive safety protections for roadway workers such as those performing utility tree removal, who work near railroad lines.

33.     These regulations prescribe safety standards related to the movement of roadway workers and equipment where these operations affect the safety of roadway workers.

34.     For example, federal regulations require the establishment of "exclusive track occupancy."

35.     Exclusive track occupancy is a method of establishing working limit on tracks in which movement of trains and other equipment is controlled by the train dispatcher, control operator, or is restricted by flagmen.

36.     Federal regulations further require that exclusive track occupancy be "defined by one of the following physical features clearly identifiable to a locomotive engineer or other person operating a trail or railroad equipment":

a.  (1) A flagman with instructions and capability to hold all trains and equipment clear of the working limits;

b.  (2) A fixed signal that displays an aspect indicating "Stop";

c.  (3) A station shown in the time-table, and identified by train movement authority or the provisions of a direct train control system;

d.  (4) A clearly identifiable milepost sign beyond which train movement is prohibited by train movement authority or the provisions of a direct train control system; or

e.  (5) A clearly identifiable physical location prescribed by the operating rules of the railroad that trains may pass without proper authority.

49 CFR § 214.321.

37.    These regulations generally require the landowner where the work is being performed and/or company operating the work crew to obtain certain permits and hire flagmen.

38.    Iowa safety laws and regulations incorporate federal law. (Iowa Code § 88.1).

39.    These safety precautions can cost hundreds of thousands of dollars.

40.    Defendants told Plaintiff that they did not want to pay for the necessary permits and flagmen for work along the Hiawatha-Vinton railroad line.

41.    Instead, Defendants' employees removing and trimming trees along this line were instructed to do what they could to keep a safe distance from passing trains.

42.    However, at times these employees would need to walk onto the railroad tracks to remove branches that had fallen on the track itself.

43.    Employees had to do so without the required safety precautions.

44.     Employees also were required to hide when railroad employees came past to patrol.

45.     Ultimately, Plaintiff complained to Defendants about these working conditions.

46.     Plaintiff informed Defendants that the failures to obtain proper permits or to hire flagmen were causing safety issues.

47.     Plaintiff informed Defendants that employees working along the railroad line did not feel safe.

48.     Plaintiff also informed Defendants that employees were concerned that they would be fined work working along the railroad line without the proper permits.

49.     Plaintiff told Defendants that these employees did not want to continue working along the railroad line due to the lack of proper safety precautions.

50.     Plaintiff also sent a text message to Defendants listing the problems with the job site.

51.     Defendants did not take any action in response to Plaintiff's safety complaints.

52.     On or about August 10, 2020, a derecho swept through several midwestern states, including Iowa.

53.     The derecho caused high winds, tornados, torrential rain, and large hail.

54.     In response to the derecho, the Department of Homeland Security (DHS) and Federal Emergency Management Agency (FEMA) issued DR-4557-IA on August 17, 2020.

55.     This notice informed those affected by the derecho that "in a letter dated August 17, 2020, the President issued a major disaster declaration" because the President "determined that the damage in certain areas from the State of Iowa resulting from severe storms on August 10, 2020, is of sufficient severity and magnitude to warrant a major disaster declaration."

6

56.     The day after the derecho, Plaintiff worked 28 hours straight.

57.     In the days that followed, Plaintiff continued working nights and weekends to keep pace with the requested work.

58.     During this time and not long after his safety complaints, Plaintiff learned that Defendant Bauer had requested the GPS records from his company vehicle for the prior two weeks.

59.     These GPS records revealed that Plaintiff would perform work from his driveway.

60.     Defendants provided Plaintiff with a company laptop and cellular telephone.

61.     Plaintiff used is cell phone as a mobile hotspot in order to perform field work.

62.     Because Plaintiff often worked in rural areas, his internet connection was often weak.

63.     As a result, Plaintiff would often need to perform work from his driveway so he could make use of his home wireless internet connection.

64.     Defendant ITC and/or ITC Midwest informed Defendant Wright Tree Service that Plaintiff would no longer be allowed on ITC/ITC Midwest property.

65.     On September 18, 2020 Defendants terminated Plaintiff's employment.

66.     Defendants then contested Plaintiff's request for unemployment insurance, contending that the work he was performing in his driveway was a dishonest act and constituted misconduct.

67.     Defendants' actions damaged Plaintiff in the form of lost past and future wages, lost earning capacity, loss reputation, and other such damages.

68.     Plaintiff is entitled to damages for these violations.

69.     Defendants' actions damaged Plaintiff by knowingly and willfully failing to made proper overtime payments as required by law.

70.     Plaintiff is entitled to damages for these violations.

**COUNT I—WRONGFUL TERMINATION PURSUANT TO PUBLIC POLICY**

71. Plaintiff repleads and incorporates Paragraphs 1–70 and 122–39 as if pled herein, including all facts as alleged.

72.     In approximately July 2020, Plaintiff was responsible for overseeing several crews performing utility work west of Cedar Rapids, Iowa.

73.     The utility work ran along a railway line stretching approximately 25 miles between Hiawatha, Iowa, and Vinton, Iowa.

74.     Federal and state law provides extensive safety protections for roadway workers such as those performing utility tree removal, who work near railroad lines.

75.     These regulations prescribe safety standards related to the movement of roadway workers and equipment where these operations affect the safety of roadway workers.

76.     For example, federal regulations require the establishment of "exclusive track occupancy."

77.     Exclusive track occupancy is a method of establishing working limit on tracks in which movement of trains and other equipment is controlled by the train dispatcher, control operator, or is restricted by flagmen.

78.     Federal regulations further require that exclusive track occupancy be "defined by one of the following physical features clearly identifiable to a locomotive engineer or other person operating a trail or railroad equipment":

a. (1) A flagman with instructions and capability to hold all trains and equipment clear of the working limits;

b. (2) A fixed signal that displays an aspect indicating "Stop";

c. (3) A station shown in the time-table, and identified by train movement authority or the provisions of a direct train control system;

d. (4) A clearly identifiable milepost sign beyond which train movement is prohibited by train movement authority or the provisions of a direct train control system; or

e. (5) A clearly identifiable physical location prescribed by the operating rules of the railroad that trains may pass without proper authority.

49 CFR § 214.321.

79. These regulations generally require the landowner where the work is being performed and/or company operating the work crew to obtain certain permits and hire flagmen.

80. Iowa safety laws and regulations incorporate federal law. (Iowa Code § 88.1).

81. These safety precautions can cost hundreds of thousands of dollars.

82. Defendants told Plaintiff that they did not want to pay for the necessary permits and flagmen for work along the Hiawatha-Vinton railroad line.

83. Instead, Defendants' employees removing and trimming trees along this line were instructed to do what they could to keep a safe distance from passing trains.

84. However, at times these employees would need to walk onto the railroad tracks to remove branches that had fallen on the track itself.

85. Employees had to do so without the required safety precautions.

86.     Employees also were required to hide when railroad employees came past to patrol.

87.     Ultimately, Plaintiff complained to Defendants about these working conditions.

88.     Plaintiff informed Defendants that the failures to obtain proper permits or to hire flagmen were causing safety issues.

89.     Plaintiff informed Defendants that employees working along the railroad line did not feel safe.

90.     Plaintiff also informed Defendants that employees were concerned that they would be fined work working along the railroad line without the proper permits.

91.     Plaintiff told Defendants that these employees did not want to continue working along the railroad line due to the lack of proper safety precautions.

92.     Plaintiff also sent a text message to Defendants listing the problems with the job site.

93.     Defendants did not take any action in response to Plaintiff's safety complaints.

94.     Plaintiff learned that following his complaints, Defendant Bauer had requested the GPS records from his company vehicle for the prior two weeks.

95.     These GPS records revealed that Plaintiff would perform work from his driveway.

96.     Defendants provided Plaintiff with a company laptop and cellular telephone.

97.     Plaintiff used is cell phone as a mobile hotspot in order to perform field work.

98.     Because Plaintiff often worked in rural areas, his internet connection was often weak.

99.     As a result, Plaintiff would often need to perform work from his driveway so he could make use of his home wireless internet connection.

10

100.    Defendant ITC and/or ITC Midwest informed Defendant Wright Tree Service that Plaintiff would no longer be allowed on ITC/ITC Midwest property.

101.    On September 18, 2020 Defendants terminated Plaintiff's employment.

102.    Plaintiff was in fact terminated because he complained that Defendants were not following required safety precautions.

103.    Defendants then contested Plaintiff's request for unemployment insurance, contending that the work he was performing in his driveway was a dishonest act and constituted misconduct.

104.    Plaintiff's termination was in violation of clearly stated public policy of Iowa.

105.    Defendants terminated Plaintiff's employment because he complained of safety violations.

106.    The Defendants' actions violated Iowa law and well-defined public policy.

107.    Indeed, Iowa Code § 88.1 provides that "[i]t is the policy of this state to assure so far as possible every working person in the state safe and healthful working conditions."

108.    Defendants' actions violated public policy in other such ways as the evidence may demonstrate.

109.    Defendants' actions were the proximate cause of damages to Plaintiff.

110.    Plaintiff suffered in the form of lost past and future wages, lost earning capacity, loss reputation, pain and suffering, and other such damages.

111.    Defendants' actions were willful and wanton and with such reckless disregard to the rights of Plaintiff Ricardo Ramirez, that he would be entitled to punitive damages.

**WHEREFORE**, the Plaintiff, Ricardo Ramirez respectfully prays for judgment against Defendants Wright Tree Service, Inc., ITC Holdings Corp., ITC Midwest, LLC, and Jim Bauer in a sum deemed reasonable and proper for compensatory damages, and a sum deemed reasonable and proper for punitive or exemplary damages, for cost and interest and such other or further relief as just and proper.

## COUNT II——VIOLATIONS OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 201, et seq.)

122.    Plaintiff repleads and incorporates Paragraphs 1–121 as if pled herein, including all facts as alleged.

123.    Defendants are subject to the FLSA's overtime requirements as stated in 29 U.S.C. § 207.

124.    Pursuant to the Fair Labor Standards Act (FLSA) employees paid on an hourly basis are required to be paid overtime hours for hours worked in excess of 40 hours per week.

125.    Plaintiff is a non-exempt hourly employee.

126.    Despite Plaintiff's status as a non-exempt hourly employee, the Defendants have failed and refused Plaintiff the proper overtime wage payments.

127.    Defendants regularly required Plaintiff to work in excess of 40 hours per week and did not pay Plaintiff time and a half overtime as provided by the FLSA.

128.    Plaintiff's work schedule provided that Plaintiff was to work 10 hours per day on Monday through Thursday.

129.    Defendants would sometimes ask Plaintiff to work on Fridays and provided overtime pay when doing so.

130.     However, the scope of Plaintiff's duties often required him to work more than 10 hours a day during the regular Monday through Thursday work week.

131.     For example, Plaintiff often needed to spend extra hours translating documents for Wright Tree Service employees who did not speak English.

132.     Defendants did not pay Plaintiff overtime for these additional hours.

133.     Defendants knew they were not paying Plaintiff overtime for all of the extra hours he was working.

134.     Defendants nonetheless continued to deny Plaintiff these overtime payments.

135.     As such, Defendants' actions denying Plaintiff overtime were willful in nature.

136.     Defendants have failed to pay Plaintiff overtime for his work that is properly to be paid under 29 U.S.C. § 207.

137.     Plaintiff has been harmed by the failure to pay appropriate overtime.

138.     Defendants owe Plaintiff the wages for time and a half overtime work.

139.     Defendants are liable for unpaid wages, attorney fees and costs pursuant to 29 U.S.C. § 216.

**WHEREFORE** Plaintiff, Ricardo Ramirez respectfully prays for judgment against Defendants Wright Tree Service, Inc., ITC Holdings Corp., ITC Midwest, LLC, and Jim Bauer in the form of: (1) compensatory damages; (2) liquidated damages; (3) attorneys' fees and costs as allowed by 29 U.S.C. § 201 et. seq.; (4) pre-judgment and postjudgment interest as provided by law; and (5) such other relief as the Court deems fair and equitable.

Respectfully Submitted,

By:    /s/ *Bruce H. Stoltze, Jr.*
Bruce H. Stoltze, Jr. (AT0010694)
Stoltze Law Group, P.L.C.
300 Walnut, Suite 260
Des Moines, Iowa 50309
Telephone: (515) 989-8529
Facsimile: (515) 989-8530
E-mail: bruce.stoltze.jr@stoltze.law
ATTORNEY FOR PLAINTIFF

14

## JURY DEMAND

COMES NOW the Plaintiff, Ricardo Ramirez, and hereby demands a trial by jury of all issues properly triable to a jury.

Respectfully Submitted,

By:   /s/ *Bruce H. Stoltze, Jr.*
Bruce H. Stoltze, Jr. (AT0010694)
Stoltze Law Group, P.L.C.
300 Walnut, Suite 260
Des Moines, Iowa 50309
Telephone: (515) 989-8529
Facsimile: (515) 989-8530
E-mail: bruce.stoltze.jr@stoltze.law
ATTORNEY FOR PLAINTIFF

**ORIGINAL FILED VIA CM/ECF**